UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| BRIAN WINKLER, ET AL. | * | CIVIL ACTION No. 16-2715 |
| VERSUS | * | SECTION: J(2) |
| | * | |
| BP EXPLORATION & PRODUCTION, INC. | * | JUDGE BARBIER |
| | * | |
| | * | MAG. JUDGE WILKINSON |

## ORDER & REASONS

This case concerns personal injuries and other damages that allegedly resulted when a vessel's oyster rake caught on two of the so-called "orphaned anchors" left behind from the response to the 2010 Gulf of Mexico oil spill. Before the Court is Defendant BP Exploration & Production Inc.'s ("BP") **Motion to Dismiss (Rec. Doc. 18)**, Plaintiffs' Opposition (Rec. Doc. 27), and BP's Reply (Rec. Doc. 34). This motion was heard on the briefs and without oral argument. BP's primary argument is that all of the Plaintiffs' claims are preempted by the Clean Water Act and must be dismissed. As explained below, the Court disagrees with this position. However, the Court is persuaded by BP's second argument: that non-personal injury claims by two of the five plaintiffs have been released by the *Deepwater Horizon* Economic and Property Damages Settlement. Accordingly, the Court will partially grant and partially deny BP's motion.

## BACKGROUND

Although this Court has determined to not consolidate the case at bar with Multidistrict Litigation No. 2179 ("MDL 2179"), *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20,* 2010, there is some factual overlap between it and MDL 2179. On April 20, 2010, a blowout and explosions occurred aboard the mobile offshore drilling unit DEEPWATER HORIZON as it was preparing to temporarily abandon a well, known as Macondo,

approximately fifty miles from the Louisiana coast. These events resulted in, among other things, approximately 3.2 million barrels of oil discharging into the Gulf of Mexico over the course of 87 days. *See In re Oil Spill by the Oil Rig "Deepwater Horizon,"* 77 F. Supp. 3d 500, 525 (E.D. La. 2015). BP owned a majority interest in the Macondo Well, was the well's designated "operator," and held a majority interest in the lease of the relevant block of the outer continental shelf. Consequently, BP was designated a "responsible party" for the oil spill under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701, *et seq.*

"The response to this oil spill was unprecedented in size and complexity." *In re Oil Spill by the Oil Rig "Deepwater Horizon,"* 148 F. Supp. 3d 563, 570 (E.D. La. 2015). Pursuant to the Clean Water Act ("CWA") and the National Contingency Plan ("NCP"), the Federal On-Scene Coordinator ("FOSC") was in charge of the response, including the direction of all Federal, State, and private actors. *See* 33 U.S.C. § 1321(c)(2), (c)(3), 40 C.F.R. §§ 300.120(a), 300.135(d), 300.305(d)(2).[1] As a responsible party, BP was required to and did participate in the response, but BP's actions were ultimately at the direction of and/or authorized by the FOSC. *See, e.g.*, 33 U.S.C. §§ 1321(b)(7)(B), (c)(3),(5), 2703(c)(2),(3), 2704(c)(2)(B),(C).

One aspect of the response to the Macondo/DEEPWATER HORIZON spill involved placing more than 3.8 million feet of containment boom in coastal waters to capture oil that the wind and tides carried landward. Thousands of Danforth anchors held this boom in place. Plaintiffs claim that buoys marked the location of the anchors. Eventually, the boom and buoys were removed from the water. However, response workers could not locate or retrieve all of the anchors, and approximately 1,700 anchors (2%-3% of those deployed) were left on the water bottoms. In 2011, the Coast Guard commissioned several studies to determine whether workers

---

[1] The CWA's oil spill response provisions and the NCP are discussed fairly extensively in *In re Oil Spill by the Oil Rig "Deepwater Horizon,"* MDL 2179, 2012 WL 5960192 (E.D. La. Nov. 28, 2012).

should retrieve these "orphaned" anchors. Those studies concluded that leaving the anchors in place to degrade via natural processes "would derive the greatest net environmental benefit" and recommended to the FOSC that she "disapprove future analysis or removal measures related to potential navigation and/or environmental hazards purportedly posed by the presence of orphaned boom anchors." *BP America Inc. v. Chustz*, No. 13-620, Rec. Doc. 2-20 at 18 (M.D. La. Sept. 19, 2013). On July 1, 2011, the FOSC concurred in this recommendation. The Louisiana Coastal Protection and Restoration Authority objected to the FOSC's decision. In a letter dated September 1, 2011, the FOSC responded, "[I]n the absence of new data supporting the removal of these orphaned anchors, I remain steadfast in my decision." *BP America Inc. v. Chustz*, No. 13-620, Rec. Doc. 2-13 (M.D. La. Sept. 19, 2013).[2]

Nearly five years after the oil spill, plaintiffs Brian Winkler, Shawn Winkler, and Christopher Morrison were harvesting oysters from the vessel TWO RAYS (which is owned by Raymond F Vath, Jr. and leased to Raymond S. Vath, both of whom are also plaintiffs but were not onboard the TWO RAYS at the time of the allision) in Christmas Camp Lake in St. Bernard Parish when, according to the petition, "their rake caught on two unmarked anchors that had been left by BP from its oil spill cleanup operations, causing the boat to halt abruptly." (Petition ¶ 5, Rec. Doc. 1-1). Plaintiffs allege that all three occupants of the TWO RAYS were injured in the incident. Plaintiffs also allege that the TWO RAYS and the oyster beds sustained damage as well. Plaintiffs filed suit against BP in state court on February 17, 2016, asserting negligence claims

---

[2] In 2013, the Louisiana Department of Natural Resources ("LDNR") issued a cease and desist order requiring BP to remove the anchors. BP refused and sued in the United States District Court, Middle District of Louisiana, for a declaratory judgment and injunctive relief, arguing that the cease and desist order is preempted by federal law. In July of 2014, the court granted summary judgment in favor of BP, concluding that the FOSC's decision amounted to a prohibition on any future removal efforts and the LDNR's cease and desist order to the contrary was preempted by federal law. *BP America Inc. v. Chustz*, 33 F. Supp. 3d 676, 687, 694, 696-97, 700 (M.D. La. 2014). The court noted that its determination might differ once removal and response efforts have ceased. *Id.* at 696-97. The LDNR did not appeal.

under general maritime law and Louisiana law. Specifically, Plaintiffs contend that the anchors constitute underwater obstructions and that BP is liable for failing to remove or mark them. BP removed the case to this Court and then filed the instant motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).[3]

## LEGAL STANDARD

On a motion to dismiss, "[t]he central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief." *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010) (citations and quotations omitted). More specifically:

> To avoid dismissal, a plaintiff must plead sufficient facts to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. We do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions.

*Id.* (citations and quotations omitted). Furthermore, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## ARGUMENTS & DISCUSSION

**A.     Preemption**

BP argues that Plaintiffs' tort claims are preempted or displaced by the CWA. BP contends that because the CWA and its regulations placed exclusive control over the oil spill response in the hands of the FOSC, who directed the placement of the boom and anchors as part of the response and further directed that the orphaned anchors should not be removed, BP cannot be held liable under general maritime law or state law for following the FOSC's directive. According to BP,

---

[3] Plaintiffs did not file a motion to remand. It appears this Court has jurisdiction under 28 U.S.C. §§ 1332 (diversity) and 1333 (admiralty).

4

"Were it otherwise, a court applying federal common law might find itself in disagreement with the FOSC regarding a matter squarely within the FOSC's specialized expertise[,] . . . [which is] not the scheme that Congress enacted." (BP Memo. At 14, Rec. Doc. 18-1).

The Court is very familiar with this argument.  In 2012, the Court ruled in MDL 2179 that tort claims against Nalco, the manufacturer of a chemical dispersant that was used during the oil spill, by individuals who allegedly were harmed by exposure to Nalco's dispersant were preempted by the CWA and the NCP.  *In re Oil Spill by the Oil Rig "Deepwater Horizon,"* MDL 2179, 2012 WL 5960192 (E.D. La. Nov. 28, 2012) (hereinafter, the "*Nalco* Order").  The Court explained that Congress determined in the CWA that the best way to ensure the effective and immediate removal of a large oil spill was to require that the President (i.e., the FOSC) direct all levels of the response, including whether, when, what, and how dispersants should be used. *Id.* at *13-14.  Because the FOSC authorized the use of Nalco's dispersant, "it would be improper for the Court to second guess the FOSC's decision to use (or not use) [that] dispersant" through the vehicle of a tort suit. *Id.*  The Court further reasoned:

> If the Court were to permit the [personal injury claims against Nalco] . . . then, during the next Substantial Spill or "spill of national significance," the threat of liability might cause the manufacturer of dispersant X to refuse to provide its product, even though the FOSC determined that dispersant X should be used.  Such a refusal, or perhaps even a hesitation by the manufacturer, would conflict with the statutory and regulatory design of placing the FOSC in charge of all levels of the response and empowering him or her to determine if, when, where, and how dispersants should be used.  More importantly, this refusal would deprive the response of a tool expressly contemplated by federal law and, consequently, impede the FOSC's ability to "ensure effective and immediate removal" of oil and the "efficient, coordinated, and effective" response intended by the NCP.  Thus, despite the fact that the [personal injury claims against Nalco] avoid a direct attack on the FOSC's decisions to use [Nalco's dispersant], they still stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

*Id.* at *15 (footnotes omitted).[4]

However, a critical fact distinguishes this case from the *Nalco* Order: Here, the defendant is a "responsible party." The CWA requires that "[e]ach Federal agency, State, owner or operator, or other person participating in [oil spill response efforts under the CWA] shall act in accordance with the [NCP] or as directed by the [FOSC]." 33 U.S.C. § 1321(c)(3)(A). In an effort to encourage immediate and effective responses, the CWA immunizes spill responders against removal costs and damages that "result from actions taken or omitted to be taken in the course of rendering care, assistance, or advice consistent with the [NCP] or as otherwise directed by the [FOSC] relating to a discharge or a substantial threat of a discharge of oil." *Id.* § 1321(c)(4)(A); *see* H.R. Rep. No. 101–653, at 45 (1990) (Conf.Rep.), *reprinted in* 1990 U.S.C.C.A.N. 779, 825. However, Congress explicitly declined to extend this immunity to a responsible party, such as BP. 33 U.S.C. § 1321(c)(4)(B)(i). Furthermore, the CWA places liability on the responsible party for any removal costs or damages that are immunized under § 1321(c)(4)(A). *Id.* § 1321(c)(4)(C).[5] These provisions reflect that Congress intended that responsible parties like BP would be liable for

---

[4] The Court reached a similar conclusion with respect to private entities that were contracted or subcontracted by BP to spray dispersant. *See In re: Oil Spill by the Oil Rig "Deepwater Horizon,"* MDL 2179, 2016 WL 614690 (E.D. La. Feb. 16, 2016).

[5] The relevant provisions of the CWA provide:

> (4) Exemption from liability
>    (A) A person is not liable for removal costs or damages which result from actions taken or omitted to be taken in the course of rendering care, assistance, or advice consistent with the National Contingency Plan or as otherwise directed by the President relating to a discharge or a substantial threat of a discharge of oil or a hazardous substance.
>    (B) Subparagraph (A) does not apply--
>       (i) to a responsible party;
>    . . .
>    (C) A responsible party is liable for any removal costs and damages that another person is relieved of under subparagraph (A).

33 U.S.C. § 1321(c)(4).

damages that result from actions directed by the FOSC in response to an oil spill.[6]  Accordingly, the Court rejects BP's preemption argument.

### B. Settlement Release

BP also argues that the non-personal injury claims by Raymond F. Vath, Jr. (who owned the TWO RAYS) and Raymond S. Vath (who leased the TWO RAYS) are released as part of the *Deepwater Horizon* Economic and Property Damages Settlement ("Settlement").  Plaintiffs do not dispute that the Vaths are class members.  The Settlement required class members to release:

> all claims arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident, including any and all actions, claims, [etc.,] . . . of any kind or nature whatsoever, . . . past or present, whether known or unknown, including claims for any and all Unknown Claims or damages, future injuries, damages or losses not currently known, but which may later develop, provided they arise out of, are due to, result from, or relate in any way to, directly or indirectly, in whole or in part, the Deepwater Horizon Incident, . . . and whether or not such cla[i]ms were or could have been raised or asserted before the Court, and regardless of whether … existing now or arising in the future, arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident.

(Settlement § 10.2, Rec. Doc. 6430-1).[7]  "Unknown Claims" is defined as

> all past, present and future claims and damages arising out of facts, including new facts or facts found hereafter to be other than or different from the facts now believed to be true, arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident covered by the Release in Section 10 that any Natural Person or Entity providing a Release, including the Plaintiffs and Economic Class Members, do not, in whole or in part, know or suspect to exist and which, if known by them, might have affected their decision to provide such Release, including all claims arising out of new facts or facts found hereafter to be other than or different from the facts now believed to be true.

---

[6] It is worthwhile to note that BP was "responsible" for the oil spill not only by virtue of the strict liability scheme in the CWA and Oil Pollution Act, but also in the sense of traditional tort liability.  *See In re Oil Spill by the Oil Rig "Deepwater Horizon,"* 21 F. Supp. 3d 657, 746-47 (E.D. La. 2014) (finding BP's conduct was "reckless" and assigning to it 67% of the fault for the blowout, explosion, and oil spill).

[7] This release does not apply to "Bodily Injury Claims." (Settlement § 10.2, Rec. Doc. 6430-1).

7

(*Id.* § 10.5). "Deepwater Horizon Incident" is defined to include "Response Activities, including the VoO Program." (*Id.* § 38.43). "Response Activities" means

> the clean up, remediation efforts, and all other responsive actions (including the use and handling of dispersants) relating to the releases of oil, other hydrocarbons and other pollutants from the MC252 Well and/or the *Deepwater Horizon* and its appurtenances, and the Deepwater Horizon Incident.

(*Id.* § 38.125).

Plaintiffs do not address the language of the release in their opposition. They respond instead by arguing that their settlement with BP

> was based upon damage to their oyster beds from the oil released in the spill. The claims at issue in this suit, however, are different and not related to the [BP] oil spill. . . . [T]he decision to remove the buoys marking the locations of the anchors was not a response to the oil spill. The anchors were not orphaned by the oil response effort, but were orphaned by [BP] when it negligently and illegally removed the buoys marking the location of their "orphaned" anchors.

(Opp'n at 5, Rec. Doc. 27 (paragraph break omitted)).

Plaintiffs cannot avoid the language of the release by ignoring it. The Settlement releases past and future claims, including claims that arise from new facts, so long as the claims relate in any way to the "Deepwater Horizon Incident," which includes response activities. It is undisputed that the anchors were placed as part of the response to the oil spill. The Vaths' claims arose when the TWO RAYS' rake struck two of these anchors. The language in the release is broad enough to capture the Vaths' claims. The Vaths' claims are released and will be dismissed. The claims by Brian Winkler, Shawn Winkler, and Christopher Morrison, which are for personal injury, are not dismissed.[8]

---

[8] It appears that the claim for damage to the oyster bed belongs to one or both of the Vaths, along with the vessel damage claim. This is not entirely clear, however. To the extent the claim belongs to the Vaths, it is released by the Settlement. To the extent it belongs to one of the Winklers or Morrison, BP has not argued that it is released by the Settlement and, therefore, it is not dismissed by this Order.

## CONCLUSION

For the reasons stated above,

IT IS ORDERED that BP Exploration & Production Inc.'s Motion to Dismiss (Rec. Doc. 18) is GRANTED IN PART and DENIED IN PART.

IT IS FURTHER ORDERED that the claims by Raymond S. Vath and Raymond F. Vath, Jr. are DISMISSED with prejudice.

IT IS FURTHER ORDERED that the claims by Brian Winkler, Shawn Winkler, and Christopher Morrison are not dismissed and are subject to further proceedings of this Court.

Signed in New Orleans, Louisiana, this 7th day of September, 2016.

_____
United States District Judge